Final case for argument this morning is 15-3148, Kermes v. DHS This case is 15-3148, Kermes v. DHS In this case during the arbitration the deciding official made a vague reference to having heard from NGOs that my client, or that there was a loss of trust. During cross-examination for the first time it was the ex parte communications with these NGOs. During the course of that discussion, the deciding official stated that my client's Facebook posting contributed to a loss of trust between the Border Patrol and the NGOs. He also said that the ex parte communications diminished his ability to carry out the mission of the Border Patrol. These ex parte communications were the first direct evidence, in this case, of any actual harm to the Border Patrol because of my client's conduct in making his Facebook posts. I guess I'm a little unclear on what your argument precisely is because in the proposal letter, I mean, it was clearly stated that the reason the public and that these comments would have a negative attention, embarrassment to the agency, etc. So why was sort of a subcategory of that a surprise or prejudicial to your client in any way? I mean, he never responded to that. He didn't contend that there was no impact. The agency told him there was an impact and that was one of the reasons they were taking this. At most, it's cumulative, in my view, the particular detail of that. Your client didn't seem to dispute that. Your Honor, I'm afraid I must disagree. During a subsequent information request, we asked the agency to produce any evidence of actual harm to the public. In our effort to defend against the proposal against my client, we engaged in a vigorous defense, among which was the claim that the agency cannot establish harm. So when the agency in its proposal made a generalized claim that there was harm to the public, we tried to address that through our specific conversations with NGOs that harmed the trust that the Border Patrol has with these NGOs, a segment of the public. That was startling to us because... These kinds of cases where an employee is getting sanctioned for some reason and the deciding official concludes that the misconduct hurts public agency's ability to do its mission and hurts the employee's ability to function as a respected employee of the federal government, is it required under the law that the deciding official have hard evidence? Does the deciding official have to go out and do a survey of the local public? My understanding was that's not necessarily required. It's permissible for deciding officials to make those kinds of findings without supporting evidence per se. Your Honor, you're absolutely correct. For instance, the PBS broadcast by itself. The agency can legitimately say that there was damage to the agency and it's inferred because of the broadcast. The problem we have is this. Their proposal made mention of this broadcast, but in terms of the specification, it listed things that accounted for 19 seconds of a 25-minute broadcast. And to your point, harm is only one issue. Harm goes, for instance, to whether or not the misconduct alleged can be proved. In this particular case, the ex parte communications not only went to help establish that the case that they made against my client could be proved, but more importantly for us, it went to the penalty. And what did the deciding official say? He said very specifically that he factored these ex parte communications and the loss of trust that they evidence into my decision on how to correct the behavior. This is classic in terms of the Ward case, Your Honor. He in fact reduced the proposed penalty. Yes, Your Honor, but... You're saying it would have been reduced to zero or zero days suspension? Your Honor, my contention from day... Your Honor, I think it's important to understand that in our sector, we have great relations with the Border Patrol and we always have our guys accept responsibility. In this particular case, from day one, I as his lawyer and my client have always felt that there should be no liability, zero, no days. If they want to give him a letter of caution, which is not disciplinary under our system, I'm not going to object to that. But we felt that his conduct was protected by the First Amendment, that his conduct in terms of the statements to, for instance, the PBS producer, Mr. Brian Epstein, were so de minimis, it was ridiculous that the agency was relying on the statement of Go Pound Sand, or if you don't like it, don't look at it, as evidencing misconduct by a Border Patrol agent who was called at his home on an unlisted number and being asked about what he believed to be private Facebook postings. I can't imagine any other person, including the chief in this case, acting in a matter that was any more civil than my client did. And again, this goes to the ex parte communications... Was the statement about Pounding Sand, I got the sense that the important thing here was the actual Facebook posting. I mean, if I think if there had just been a call from a television station and he was asking about Border Patrol activities, and your client, Mr. Kermes, had said, Go Pound Sand, I'm not going to talk to you, I'd be surprised if that would have led to discipline. Your Honor, you might be correct, but the fact of the matter is during the arbitration, the arbitrator said that he considered the Go Pound Sand comment. And we separately have argued that that was inappropriate and a procedural due process violation, because that was a statement we had noted in a written reply. And unlike the case Wilson, which the agency used to defend against it being a procedural due process case, we did not raise it again. We had no opportunity. In fact, we had no desire to defend against that in a written reply, in an oral reply, or as in Wilson, in a phone call with a designing official. That was a procedural due process violation, which is a separate argument for remanding this case. But in this case, in terms of the due process argument in reference to the ex parte communications, if you look at the record, it's crystal clear. The chief said he factored those into my decision on how to correct that behavior. It's not a matter of whether or not he enhanced the penalty. It's a matter of what degree he used those ex parte communications to enhance the penalty. But I guess I'm still a little unclear. He was on notice that there were I mean, the proposal said because it's damaged the reputation of the agency, etc. Did he try to refute that in any way? Is it his position that there was no evidence of such damage and therefore there's no damage? Is that what he was arguing? You know, Your Honor, our argument during the course of this case was that the 19 seconds that the specification represented in that broadcast was very de minimis. We're talking about the U.S. Border Patrol. I'm currently representing an agent who's in charge with murder for a cross-border shooting in Nogales, Arizona. They have numerous other issues before them that renders what my client did to be almost meaningless. Even in the broadcast itself, this didn't even appear until the 20th minute, and it only lasted for 19 seconds. It was cumulative in terms of, oh, look, this is what else this agent did. In the end, it comes down to having a fair opportunity to defend against the proposal and the evidence that the agency should have provided to us. I guess I'll try one more time. Maybe I'm not being clear. If he's on notice that the agency is taking the sanction because they damaged the relationship between the agency and the public, and if he doesn't respond to that, what more would he have arguably responded to if they had said, and this is based on contact with the NGOs? Well, to answer your question, Your Honor, I know those people. One of those people, the NGOs, is one of my law school professors. One month before the proposal came out for my client, I was addressing these very people myself, talking about the process that Border Patrol agents go through when they engage in the use of deadly force. I could have gone to these people and said, the chief is saying that you guys are claiming there's a loss of trust. And to that fact, one month before, when I was talking to Andy Silverman, the law school professor, he didn't mention these Facebook postings. He didn't mention anything involving my client. I would have had an opportunity to go to these very people who I already had contacts with to see whether or not there was any validity to the chief's assertion that there was a loss of trust, because that was their only direct evidence. All of this is important, not only in terms of establishing the validity of the charge, but certainly to the penalty. 45 days was outrageous, in my opinion, for them to even propose that. The fact that they went to 15 was recognizing substantial problems in their case. In my opinion, the reason they stayed at 15 days is because of evidence like this, where they could say, look, there's some real harm here. In the proposal, we made allocations of generalized harm. Here's some real harm. That's justifying the 15 days. And that goes to the Ward case that says that this was new. It was material. It influenced the deciding official in the determination of a penalty. That's the definition that Ward provides us in terms of a due process violation that now requires this case to be remanded back. Or frankly, I think that this court has enough to find that there isn't a substantial due process violation sufficient to say that this case not get remanded, that this case get reversed for a new constitutionally sufficient proceeding. And Your Honor, I don't know if you have your clock in front of you. Yes, I do. Why don't we hear from the government? Thank you, Your Honor. May it please the court. Good morning. As the court recognized, actual harm with respect to the misconduct charged in this case for the agency to make its next determination is not required. It is the risk of harm with respect to what the agency charges, which is at issue. Yeah, but isn't it the case, I mean, if the deciding official said he thought this was highly relevant, we're talking about what he based his decision on. So you may be right, but if we've got testimony from the deciding official that he relied on this in order to assess the harm to the public, why isn't your friend correct that there's a problem with that? Well, as the court notes, the proposal letter identifies the public as the stakeholder that the agency had great concern with respect to the misconduct. A subset of the public, as recognized by all, I would imagine most border patrol agents, are in fact NGOs. The broadcast itself, the PBS broadcast, concerned principally the relationship between the border patrol and NGOs and was focused greatly on the conduct between Mr. Kermes and NGOs. So as the court noted, the public and NGOs being a part or a component of the public was of great concern to the agency from day one in this investigation. The deciding official's testimony is cumulative and confirmed that concern, but offered no new information or doesn't demonstrate that he considered any new information. The agency from day one in this proceeding had concerns regarding the impact of Mr. Kermes' misconduct on the public, NGOs, or a function of the public. Mr. Kermes, in his written reply to the proposal letter, in fact raises the conduct of NGOs, demonstrating that he recognizes NGOs are a stakeholder group that the border patrol is concerned with and interact with on a regular basis. In fact, Mr. Kermes, in that written reply to the proposal letter, talks about how he dislikes NGOs and has opinions about NGOs. So it's hard to imagine, based on the record before the court, how Mr. Kermes wasn't on notice that his conduct with respect to NGOs were of concern in the proposal letter and to put forward evidence concerning any evidence that Mr. Kermes may have that would refute any concerns over the public. Is it possible that the evidence could have been used by the deciding official as a kicker, like in raising the penalty, above and beyond what the deciding official would have lied here? Well, as the court noted, the deciding official received a proposal that I believe is indicated in the record was for 30 days. And because, as he identifies in his entitling official's letter, mitigates that punishment to 15 days, recognizing Mr. Kermes' history of service, I believe, of 20 years. So there was no aggravation of the penalty. There was no enhancement of the penalty. In fact, the deciding official, looking at Mr. Kermes' background, reduced the penalty. Yeah, but I think the question goes to, but how do we ever know whether he would have reduced it more in the absence of this? Well, based on the record, it's not clear why he would have necessarily enhanced the punishment, given that he already had the concerns that the public would be impacted by Mr. Kermes' misconduct. Can I move you on to something else, which is that what if we thought that the allegations with regard to this phone call of Mr. Epstein were not sufficient? I mean, were just inadequate and didn't justify any kind of proposed action. What happens to your case? How do we satisfy ourselves that if the agency had exclusively relied on the broadcast stuff and the Facebook and not on the phone call, it would have reached the same result? Well, although the agency did consider conduct disclosed to the government with respect to the Go Pound Sand comments, certainly the Facebook comments alone and the biased expressions that they demonstrate regarding individuals that Mr. Kermes is directly responsible as a law enforcement officer for interacting with, as well as his ability to testify at trial with respect to showing bias and any potential issues regarding Giglio. On that basis alone, on the Facebook comments alone, there would be more than adequate support with respect to Nexus to punish Mr. Kermes for the misconduct charged. How do we know? I mean, this isn't a theoretical exercise. We're reviewing what it is this particular deciding official relied on and what he did. So how do we know? I mean, you may be right as a legal matter that there's enough to justify it, but how do we know that the deciding official didn't say to himself, well, if he hadn't made that phone call, I probably would just suspend him for 10 days, but that phone call, he deserves another five days added to that. Well, the focus of the deciding official's letter, as well as his testimony, was principally on the issues concerning the Facebook comments and their impact on Mr. Kermes' ability to testify. With respect to that particular example, it's unclear how any discourteous comments to the press would... Do you know if he was ever asked if this conduct alone, would you have done the same thing with this conduct alone? So I don't believe there's any isolation or separation that's in the record in this case. Can I ask you about that comment? What was the agency's position on what he was supposed to say or do? He's got an unlisted phone number. He gets a call when he's on his way out to go to work. He's arguably from, I think this is undisputed, but he's pretty courteous up front in trying to be responsive and does the right thing, which is says repeatedly, you shouldn't be calling me, you should be calling my agency and their public affairs office. I would assume that's precisely what the agency wants somebody to do, but this guy wouldn't let it go and obviously had a gotcha question. So what should he have done? What was he compelled to do in response to Mr. Epstein's pressing this point? He was supposed to do what he did up until the point where he told the gentleman, Mr. Epstein, to go pound sand. He did, in fact, erect... After Epstein said the stuff and it got him annoyed, clearly a hang up annoyed, not a gotta go now, see ya. What if he had just hung up on him? Would that be a chargeable event? Under those circumstances, I doubt that that conduct would have been considered by the agency, simply hanging up. The issue that was disclosed, the comment that was disclosed in Mr. Kermey's own reply brief was the go pound sand comment. I believe that is certainly the agency's focus with respect to conduct involving Mr. Epstein. The agency would likely agree that up until that point, Mr. Kermey said the things that were appropriate to say. It's hard to imagine that the hanging up on Mr. Epstein alone would have resulted in that conduct being considered. It was the go pound sand comment. Because it was discourteous? What is the standard that he should have been more courteous, that you shouldn't be discourteous to someone who calls you at your home and your unlisted number and presses you over a matter? I'm having a hard time seeing what the standards are here. Well, Your Honor, the agency issues standards of conduct that concern public contact. As law enforcement officers, in particular, who interact with the public, who interact with press, who interact with those they apprehend, they are held and are put on notice. So if it was a telemarketer calling him and he just pressed and the guy said something even more unpleasant than go pound sand, would that be a chargeable event? Under those circumstances, if the telemarketer wasn't calling Mr. Kermey to talk about border patrol issues, it would be hard to imagine the agency would move forward any punishment with respect to a telemarketer. Mr. Epstein was calling to talk about the border patrol, in particular, Mr. Kermey's conduct and misconduct. But you're not suggesting that the agency's position is that he got charged because he refused to talk to him, right? No, Your Honor. And in fact, the proposal letter is focused on the Facebook comments and the broadcast of those comments. The agency only became aware of the go pound sand comments as a function of the written reply to the proposal letter. So the agency did not have any awareness and made no decisions regarding charging on the go pound sand comment until it was disclosed to the government in Mr. Kermey's own filings at the arbitration. Let me ask you, we've been focusing on the Facebook posting by Mr. Kermey. Suppose instead of this, you didn't have a Facebook posting, but Mr. Kermey had sent this picture with the comment under it to some friend of his via an email attachment. And that was the only exposure that the item received. But then Mr. Epstein somehow had been able to get into his email account or had gone to the person who received it and had received it. Would we have a different case? The second scenario, no, there wouldn't be. If Mr. Kermey sends these comments and the picture to a third party and the third party willingly provides that picture to Mr. Epstein, and then Mr. Epstein, as a function of working for PBS, broadcasts that comment, that would be... How has the agency been impacted if there's just one person who has received it? Well, in that particular case, that one person is still a member of the public and may have an adverse opinion of the Border Patrol, its ability to conduct its mission, as well as Mr. Kermey's ability to do his duties. I recognize that that is a harder case than the one presented here. Well, supposing the person had sent an email back to Mr. Kermey saying, yeah, I agree with you. He obviously doesn't have an unfavorable position view. And what if, though, Mr. Epstein had hacked into his email account? Would we be here today? Well, under those circumstances, and I know there's been some comment in the briefs regarding hacking and even some citations. Oh, no, just assume. My hypothetical is he sends the email to a friend, the friend receives it, doesn't do anything with it, but somehow Mr. Epstein hacked into his email account, and in that way, the communication came to light. There is no legal basis that the government's aware of that would mitigate its ability to move forward with an adverse action on that basis, just because of a third party's actions, whether they be hacking or not. So should federal employees believe that any emails, whether it's on their private email account or their employee account, they just don't have any expectation of privacy whenever they do any kind of communication with a single person? No. For an individual that is serving in a law enforcement capacity, making comments regarding individuals that he or she is supposed to be responsible for, that is the kind of conduct that is of concern to the agency. Even if that's made in private? If Mr. Epstein had overheard Mr. Kermes make this comment to someone, just to a friend, would that be a basis? And then he had reported that he had heard this at an event, and then the agency had moved forward. That seems a little bit of a reach, don't you think? I think that would be a far tougher case than the one that was presented here. Where Mr. Kermes provided these comments on Facebook to at least 300 people, as he acknowledges, and those comments were clearly acquired by PBS and broadcast. I certainly agree that there are... So you're confining the government's position to this case? You're not saying the government would go forward if he had just sent an email to a friend and then had been hacked? No, Your Honor. You're not advancing that position? We are confined to the facts before us in this particular case, from the government's perspective. We certainly appreciate that there are a series of sliding scales of possibilities in this case. I would also state to your question, Your Honor, that the First Amendment, the government fully recognizes, is a component of any question of employees' speech on or off duty. In this particular case, with respect to the First Amendment arguments, we would argue that the comments that are at issue are not a matter of public concern. But even if they were, the court should engage, as the arbitrator did, in the balancing test that weighs those comments against the agency's interests. And in this case, the agency's interests are quite great, with respect to its ability to engage with the public and engage in its mission, as well as to Mr. Kermes' ability to do his job, both interacting with those he's responsible for apprehending and addressing in a law enforcement capacity, as well as his ability to give testimony. But certainly, the First Amendment would have interplay with and has an important role in determining how to evaluate these types of comments and employees' speech generally. Thank you. Thank you, Your Honor. Your Honor, you don't have to guess about the influence of the ex parte statements on the penalty. The deciding official said that he factored them in. And you will find that in the joint exhibits, page 171, where he says that he factored that right into his decision about how to correct that behavior. As I've argued before, it's not a matter of whether he did it. It's a matter of degree. You also, I think, should look at the proposal, because one-third of the proposal is focused on the statements that Mr. Kermes made to the PBS producer. And whether or not the deciding official considered those, the answer is he did, and he said so. And you will find that in the appendix at pages 142 and 180. In both cases, he's telling you that he considered those statements, including the go-pound-sand statement when he was determining what to do with Mr. Kermes. In reference to the First Amendment claim, I would invite the court to seriously consider that claim, because I think rather than having this case be remanded for either a new constitutionally sufficient proceeding or for any additional fact-finding, I think the First Amendment case, the claim, would be dispositive of this case. And I think that the First Amendment, and it's surprising that Border Patrol continually fails to recognize that Border Patrol agents have First Amendment rights, but they do. In this particular case, I think it's important to note that these were off-duty statements made in a private Facebook setting. This was not open to the public when he made these. And the deciding official has agreed that when he was making these statements, he was not making them in reference to his official duties or his employment. The deciding official agrees with this in the appendix at 165-66. The picture in the statement, run, you little bastards, and importantly, the Supreme Court has said that these statements have to be considered in the context of the entire record. They cannot be viewed in isolation just in terms of the posting itself. The entire record here establishes that that statement, run, you little bastards, reference a new practice by the aliens of running away instead of complying with agents' commands to stop and sit down. The testimony was clear that years ago, agents used to be able to go out there and capture 100 people by themselves and bring them in successfully. In 2009, when Agent Kermes made this posting, he was frustrated with the fact that clearly there had been a change in the field. Clearly, these groups of aliens were now, they call it quailing, were making the election to all run in different directions and make it much harder for the agents to capture them. So clearly, in contrast to I think the point you made a minute ago, his posting had an intimate relationship with his work and his duties as an officer. That certainly could be one inference, Your Honor. But I think another fair inference is that any person, whether he was a Border Patrol agent or a private citizen, would be concerned with this tactic in the field. I mean, particularly today, we have so much concern and worry about the border. What is happening in the field in terms of the actions by the aliens to not be apprehended is certainly something that is of huge public concern, regardless of whether or not a Border Patrol agent is making that statement. If you look at, well, my time is up. I would just ask the Court to consider that argument. Thank you. Thank you, Your Honor. Thank both counsel and the cases submitted. And that concludes our proceedings this morning.